UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COBANK, ACB,<br><br>Plaintiff,<br><br>v.<br><br>CABLE ONE, INC.,<br><br>Defendant. | **CIVIL ACTION**<br><br>No. 1:26-cv-08935-VM |

**REDACTED MEMORANDUM OF LAW ON BEHALF OF DEFENDANT CABLE ONE, INC. IN RESPONSE TO THE ORDER TO SHOW CAUSE ISSUED *EX PARTE* ON OCTOBER 9, 2026, AND IN SUPPORT OF DEFENDANT'S MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER**

CRAVATH, SWAINE & MOORE LLP
Michael A. Paskin
Justin C. Clarke
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
mpaskin@cravath.com
jcclarke@cravath.com
*Attorneys for Defendant Cable One, Inc.*

## TABLE OF CONTENTS


**PRELIMINARY STATEMENT** ..... 5

A. The Parties ..... 8

B. The MBI Put ..... 9

C. CABO's Negotiations with GTCR, CoBank, and Other Liquidity Providers ..... 11

D. This Action ..... 14

**ARGUMENT** ..... 15

I. COBANK FAILS TO ESTABLISH AN ENTITLEMENT TO A TEMPORARY RESTRAINING ORDER ..... 15

A. CoBank Has Failed To Show It Will Suffer Irreparable Harm. ..... 16

B. CoBank Cannot Demonstrate a Likelihood of Success on the Merits. ..... 19

C. The Balance of the Hardships and Public Interest Do Not Tip in CoBank's Favor. ..... 25

II. THE TRO IS BARRED BY LACHES ..... 27

III. THE TEMPORARY RESTRAINING ORDER IS PROCEDURALLY DEFICIENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 65 AND S.D.N.Y. LOCAL RULES. ..... 29

IV. SHOULD THE COURT RETAIN THE TRO, IT SHOULD ORDER COBANK TO POST A SUBSTANTIAL BOND. ..... 31

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*159 MP Corp. v. Redbridge Bedford, LLC*,
33 N.Y.3d 353 (2019) .....13

*Austin v. Altman*,
332 F.2d 273 (2d Cir. 1964).....15

*Bartolini v. Town of Yorktown*,
2026 WL 189725 (S.D.N.Y. Jan. 23, 2026) .....15

*Bell & Howell: Mamiya Co. v. Masel Supply Co.*,
719 F.2d 42 (2d Cir. 1983).....2

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
910 F.2d 1049 (2d Cir. 1990).....17

*Bragg v. Jordan*,
669 F. Supp. 3d 257 (S.D.N.Y. 2023).....15

*Chai v. Maginn*,
2024 WL 4356303 (Del. Ch. Oct. 1, 2024) .....13

*CNL-AB LLC v. E. Prop. Fund I SPE (MS Ref) LLC*,
2011 WL 353529 (Del. Ch. Jan. 28, 2011).....13, 14

*Com. Tankers Corp. v. Nat'l Mar. Union*,
553 F.2d 793 (2d Cir. 1977).....17

*Faircloth v. Rash*,
373 A.2d 870 (Del. Super. Ct. 1977) .....5

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009).....2

*Flynn v. Rogers*,
172 Ariz. 62 (1992).....13

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*,
415 U.S. 423 (1974).....16

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999).....1, 8, 9

*Hanson Tr. PLC v. SCM Corp.*,
617 F. Supp. 832 (S.D.N.Y. 1985), *rev'd on other grounds*, 774 F.2d 47 (2d Cir. 1985) ....................11

*Hossain v. Mediastar Ltd.*,
2025 WL 2578128 (S.D.N.Y. Sept. 5, 2025)....................4

*In re AMR Corp.*,
502 B.R. 23 (Bankr. S.D.N.Y. 2013)....................12

*In re AppliedTheory Corp.*,
323 B.R. 838 (Bankr. S.D.N.Y. 2005)....................9

*In re Direct Response Media, Inc.*,
466 B.R. 626 (Bankr. D. Del. 2012)....................6

*In re F-Squared Inv. Mgmt., LLC*,
600 B.R. 294 (Bankr. D. Del. 2019)....................7

*In re Feit & Drexler, Inc.*,
760 F.2d 406 (2d Cir. 1985)....................4

*In re Pack Liquidating, LLC*,
2025 WL 2587577 (Bankr. D. Del. Sept. 5, 2025)....................6, 7

*In re Viscount Air Servs., Inc.*,
232 B.R. 416 (Bankr. D. Ariz. 1998)....................6

*In re White*,
591 B.R. 884 (Bankr. D. Utah 2018)....................6

*Int'l Controls Corp. v. Vesco*,
490 F.2d 1334 (2d Cir. 1974)....................4

*Interlink Int'l Fin. Servs., Inc. v. Block*,
145 F. Supp. 2d 312 (S.D.N.Y. 2001)....................17

*Isgro v. Wells Fargo Bank, N.A.*,
2019 WL 273373 (Ariz. Ct. App. Jan. 22, 2019)....................13

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
917 F.2d 75 (2d Cir. 1990)....................2

*Lapa v. JP Morgan Chase Bank, N.A.*,
2022 WL 3290677 (S.D.N.Y. Aug. 11, 2022)....................1

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
75 F. Supp. 3d 592 (S.D.N.Y. 2014)....................1, 2, 5

*Mathieu v. Mahoney*,
174 Ariz. 456 (1993)....................15

*Moore v. Consol. Edison Co. of N.Y.*,
409 F.3d 506 (2d Cir. 2005)....................2

*Pennantia, LLC v. Rose Cay Mar.*,
LLC, 2025 WL 2388807 (S.D.N.Y. Aug. 18, 2025)....................4

*Rowe v. Great Atl. & Pac. Tea Co.*,
46 N.Y.2d 62 (1978)....................13

*Sanofi-Synthelabo v. Apotex, Inc.*,
488 F. Supp. 2d 317 (S.D.N.Y. 2006)....................17

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
120 F.4th 59 (2d Cir. 2024)....................2, 3

*Wesley Coll., Inc. v. Girard Bank Delaware*,
1984 WL 8214 (Del. Ch. Jan. 20, 1984)....................11

**Statutes & Rules**

6 Del. C. § 1303(a)....................6

6 Del. C. § 1305(a)....................5

6 Del. C. § 1307(a)....................3, 9, 10

6 Del. C. § 1308(b)....................3

11 U.S.C. § 548(d)(2)(A)....................6

28 U.S.C. §§ 2201–2202....................1

Ariz. Rev. Stat. Ann. § 44-1003(A)....................6

Ariz. Rev. Stat. Ann. § 44-1007....................3, 9, 10

Ariz. Rev. Stat. Ann. § 44-1008(B)....................3

Fed. R. Civ. P. 65....................1, 2, 15, 16, 17, 18

Local Civil Rule 6.1(d)....................15

Ind. R. VII.D. ....................................................................................................................16

N.Y. Debt. & Cred. Law § 272(a).........................................................................................6

Uniform Fraudulent Transfer Act ......................................................................1, 5, 6, 9, 10

**Other Authorities**

*N.Y. Prac., Com. Litig. in N.Y. State Courts* § 129:21 (5th ed.) ......................................................9

*Wright & Miller's Federal Practice & Procedure* § 2949 (3d ed. 1998).......................................3

## PRELIMINARY STATEMENT

Plaintiff CoBank is a lender to Cable One, Inc. ("CABO" or the "Company"). Its interests with respect to CABO are monetary: under its loans to the Company, CoBank is entitled to periodic payments of principal and interest and repayment of the principal when the loans mature between February 2028 and October 2029.[1] CABO has never missed a loan payment, nor does CoBank allege that it has or will do so imminently. Were that to occur, CoBank could pursue the remedies available to all lenders under the Fourth Amended and Restated Credit Agreement, dated February 22, 2023 (the "Credit Agreement").

CoBank has known for many months of the timing of the put right (the "MBI Put") by investment firm GTCR LLC ("GTCR"), a contractual obligation that requires CABO to buy—at a formula-based price set nearly six years ago—the remaining 55% of Mega Broadband LLC ("MBI") CABO does not currently own. During the past several months, CABO has negotiated with CoBank, GTCR, and other funding sources concerning new financing for CABO, a portion of which would be used to repay revolving credit obligations previously incurred by CABO and earmarked to fund the MBI Put. CoBank put forward several financing proposals of its own, [redacted] The resulting transaction with GTCR, its co-investors, and all of CABO's revolving lenders (other

[1] The majority of CoBank's loans—$959 million of the $1.1 billion total—do not mature until October 2029.

than CoBank)—which would allow CABO to repay or refinance nearly $2 billion of its nearest term secured debt, plus $480 million in revolving debt obligations earmarked to fund the MBI Put—is likely to be the only actionable alternative readily available on a sufficiently timely basis and without potentially significant costs to CABO. (*See* Koetje Decl. ¶ 39.)

Upset that CABO chose the proposed transaction with GTCR and its lender group as being in the best interests of CABO over CoBank's preferred transaction [redacted], CoBank embarked upon a campaign to torpedo the GTCR deal (the "Transaction"). It strategically bought CABO debt—on information and belief, at an above-market price and despite its made-for-litigation contention that CABO is insolvent—and lobbied CABO's revolving credit lenders to oppose the Transaction in an attempt to fracture their coalition of support for CABO and its financing plans.[2] It threatened litigation while deferring any request for relief as long as possible. And CoBank waited until ***the very day that closing was set to occur*** before rushing into court seeking to exploit an "emergency" of its own creation.

CoBank filed its Complaint and TRO motion *ex parte*—a heavily disfavored procedure—accompanied by a highly misleading account of the parties' history. Among other things, CoBank failed to disclose to the Court that CoBank had known of the MBI Put for months; CABO's Credit Agreement with CoBank expressly authorizes the MBI Put; CoBank approved two prior financing transactions that were themselves designed to finance CABO's repayment of obligations in respect of the MBI Put exercise that CoBank now complains of;

---

[2] The support of a majority of continuing lenders is required for the implementation of the Transaction. Because a majority of the continuing lenders support the Transaction, CoBank's support is not required.

CoBank had been working to disrupt the alternative financing arrangements CABO had negotiated; and the TRO jeopardizes a delicate and painstakingly negotiated financing transaction with numerous third parties that provides other critical benefits to CABO beyond the MBI Put. Without the benefit of this context, the Court entered an *ex parte* Order to Show Cause ("Order") including a TRO precluding CABO from satisfying its contractual obligation to close the MBI Put, and without requiring CoBank to post a bond.

CoBank has failed to establish even a baseline entitlement to temporary injunctive relief, and the TRO should be dissolved immediately for any of the following five reasons.

*First*, its purported harm is neither imminent nor irreparable. For all its bluster about CABO's purported insolvency or near-insolvency, CoBank does not allege—nor could it—that CABO has missed an interest or principal payment or will do so imminently. Should CoBank suffer actual harm, it is a secured creditor with numerous remedies available to it.

*Second*, CoBank cannot show a likelihood of success on the merits. Satisfaction of an antecedent debt such as the MBI Put obligation is reasonably equivalent value—a fact fatal to CoBank's fraudulent transfer claim. Moreover, binding Supreme Court precedent recognizes the "well-established general rule that a ***judgment*** establishing [a] debt [is] necessary ***before*** a court of equity would interfere with the debtor's use of his property." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 321 (1999) (emphasis added). Nor does the Uniform Fraudulent Transfer Act authorize relief before any transfer; its injunctive remedy reaches only "further" dispositions.

*Third*, the balance of hardships does not tip toward CoBank. The TRO harms CABO;[3] the employees of CABO (who are operating under conditions of extreme uncertainty, which has created a risk of attrition); GTCR; and existing stakeholders participating in the Transaction.

*Fourth*, the TRO is barred by the doctrine of laches, as CoBank has been fully aware of the put exercise for many months and manufactured its own emergency by waiting to seek relief until the very day of closing.

*Fifth*, the TRO fails to comply with Federal Rule of Civil Procedure 65 and related local rules, whose requirements are heightened where injunctive relief is granted without notice and an opportunity for the other party to be heard.

## STATEMENT OF FACTS[4]

### A. The Parties

CABO is a broadband communications provider incorporated in Delaware with its principal place of business in Phoenix, Arizona. CABO is the borrower under the Credit Agreement, which provides for three tranches of senior secured term loans in an aggregate principal amount of $1.65 billion and a $1.25 billion revolving credit facility (the "Revolving Credit Facility"). That debt does not mature until—at earliest—February 2028. The Credit Agreement requires CABO to make quarterly payments consisting of approximately $2.5 million

---

[3] Indeed, CABO's stock climbed by 15% when the Company announced it was nearing a transaction with GTCR on October 2, and jumped again by 30% in after-hours trading on October 8 following press reports that the Company was nearing a financing deal. However, the stock price dropped by 20% on the day this suit commenced. (*See infra* § I.C.)

[4] The exhibits cited herein are the Exhibits to the Declaration of Todd Koetje, Chief Financial Officer of CABO ("Koetje Decl.").

in principal, plus interest. The other parties to the Credit Agreement include various other lenders and an administrative agent. (*See* Ex. 1 § 1.01.)

CoBank is a federally chartered Agricultural Credit Bank, with its principal office in Denver, Colorado. CoBank is one of the lenders under the Credit Agreement. By its own account, CoBank holds approximately $1.1 billion in outstanding term loans and revolving loans under the Credit Agreement, including approximately $90 million of revolving loans purchased on the secondary market in or about the last week (*See* Ex. 2 at 1; Koetje Decl. ¶ 35), seemingly in an effort to disrupt the Transaction.

**B. The MBI Put**

In November 2020, CABO acquired from investors affiliated with the investment firm GTCR an approximately 45% equity interest in MBI, a Delaware limited liability company that provides data, video, and voice services. Under MBI's Limited Liability Company Agreement, GTCR also acquired the right (exercisable at GTCR's option) to require CABO to buy the remaining 55% of MBI in the future. The MBI Put was paired with a call right (exercisable at CABO's option) that would allow CABO to buy the remaining 55% of MBI in the future ("MBI Call"). [redacted] (Koetje Decl. ¶ 11.) That multiple was consistent with market multiples for broadband companies such as CABO and MBI at the time the formula was agreed to by the parties. (*Id.*) Thus, if the value of MBI were to rise above the call price, CABO could exercise the MBI Call to buy the remaining 55% at a discount; if the value of MBI were to fall below the call price, GTCR could exercise the MBI Put to require CABO to buy the remaining 55% at a premium.

The existence of the MBI Put and MBI Call has been public since September 28, 2020, and has been repeatedly disclosed in CABO's subsequent SEC filings. (Cable One, Inc., Current Report (Form 8-K) (Sept. 28, 2020), Item 1.01.) The specific terms of the MBI Put have been public since December 20, 2024, when CABO filed MBI's Third Amended and Restated Limited Liability Company Agreement, dated December 20, 2024 ("Third A&R LLC Agreement") with the SEC. (Cable One, Inc., Current Report (Form 8-K) (Dec. 20, 2024), Ex. 10.1; *see also* Ex. 3.)

The MBI Put is also expressly authorized as a "Permitted Acquisition" under the Credit Agreement, to which CoBank is a party. Thus, CoBank was on sufficient notice—in fact, it agreed to the transaction by virtue of its express inclusion in the Credit Agreement.

GTCR exercised the MBI Put on January 2, 2026, and the next day, as required by the relevant contractual provisions, CABO entered into a short-form purchase agreement (the "Short-Form Purchase Agreement") with MBI and GTCR, as it was obligated to do under the Third A&R LLC Agreement. (Koetje Decl. ¶ 14.) On January 5, 2026, CABO publicly disclosed those facts. (Cable One, Inc., Current Report (Form 8-K) (Jan. 5, 2026) ("Jan. 5 Form 8-K"), Item 1.01, Ex. 2.1.)

Upon GTCR's exercise of the MBI Put, MBI delivered to CABO an Option Price Statement pursuant to the Third A&R LLC Agreement setting forth its calculation based on the contractual formula. (Ex. 3, Schedule B § C(b); Koetje Decl. ¶ 15.) CABO determined there was no basis upon which to dispute GTCR's calculation of EBITDA or Consolidated Total Net Indebtedness (*i.e.*, the only inputs to the otherwise mechanical formula) used by GTCR. (Ex. 3,

Schedule B §§ A, C(b); Koetje Decl. ¶ 15.)[5] CABO recorded a $426.0 million liability on its books (the put price less the booked estimate of the equity value of GTCR's MBI interest) in the second quarter of 2026. (Koetje Decl. ¶ 15.) Since GTCR exercised the MBI Put, CABO has made numerous public disclosures regarding the anticipated transaction. In its 2025 annual report, CABO described the MBI Put and its pricing formula, the risks associated with the transaction, and "the difference between the Put Price and the fair value of the underlying equity interests in MBI." (Cable One, Inc., Annual Report (Form 10-K) (Feb. 26, 2026) at 26, 51.) In its quarterly report for the second quarter of 2026, it disclosed that the MBI Put price would be "approximately $480 million," and that CABO expected to fund the transaction, in part, with "the anticipated available capacity under the Revolving Credit Facility at the time of the transaction." (Cable One, Inc., Quarterly Report (Form 10-Q) (Aug. 6, 2026) ("Q2 2026 Form 10-Q") at 37.) And on October 2, CABO disclosed that the Company and GTCR "mutually agreed to extend the previously anticipated October 1, 2026 closing date" to October 9, 2026. (Cable One, Inc., Current Report (Form 8-K) (Oct. 2, 2026) ("Oct. 2 Form 8-K") at 1.) As public disclosures, those facts were all known to CoBank.

### C. CABO's Negotiations with GTCR, CoBank, and Other Liquidity Providers

Following GTCR's exercise of the MBI Put, CABO began discussions with a range of potential financing sources regarding a capital-raising transaction that would allow the Company to repay revolving debt earmarked to fund its contractual obligation to close on the MBI Put, extend the maturities on certain of its existing debts, and obtain adequate time and

---

[5] CoBank's suggestion in the Complaint and Motion that CABO somehow failed to exercise any valid challenge rights in respect of the put price calculation is false. (*See* Compl. ¶¶ 41-42; Motion at 4.)

resources to execute on its business plan. (Koetje Decl. ¶ 16.) CoBank, as one of CABO's existing lenders, and GTCR, as the counterparty to the MBI Put, each participated in those discussions. (*Id.*)

Beginning in early August and continuing through September, CABO and CoBank negotiated extensively concerning potential financing solutions to fund the transactions. Between August 26 and September 16, CABO's Chief Financial Officer, Todd Koetje, held at least seven scheduled calls with CoBank's representatives—one of which included CoBank's financial advisor, Houlihan Lokey—plus numerous *ad hoc* discussions. (Koetje Decl. ¶ 18.) CABO's financial advisor, Centerview Partners, separately communicated frequently with Houlihan Lokey. (*Id.* ¶ 19.)

Meanwhile, CABO, GTCR, and a group of participating lenders also had discussions regarding the indicative terms of the current financing transaction since as early as July 23. (*Id.* ¶ 26.) On August 30, 2026, CABO shared with CoBank a financing proposal arranged by GTCR. (*Id.* ¶ 20; Ex. 5.) [redacted] At that time, CoBank did not object to CABO's closing on the MBI Put; instead, it offered two financing proposals of its own [redacted]

CABO responded with a counterproposal on September 8, to which CoBank countered on September 9. [redacted]

[redacted] Mr. Koetje spoke with CoBank's representatives that same day and held another scheduled call with them on September 16, 2026. (Koetje Decl. ¶ 24.)

[redacted] Thus, CoBank's proposal was unactionable under any circumstances. (Koetje Decl. ¶¶ 29-30.) CoBank then began communicating directly with other CABO lenders to press them to withdraw their support for the viable GTCR proposal and instead participate in CoBank's own proposal. (*Id.* ¶ 30.)

After months of negotiations, by October 2, 2026, CABO, GTCR, and all of CABO's revolving lenders (other than CoBank) had aligned in principle on a financing

transaction that was set to close on October 9 (after an agreed-upon extension from October 1). The Transaction would provide CABO with a new loan of $1.3 billion, approximately $480 million of which would be used to repay revolving debt obligations previously incurred by CABO to fund the MBI Put, with the balance repaying all the Company's secured debt maturing in 2028 (other than the 2028 secured debt held by CoBank that it refuses to include in the Transaction) and covering transaction fees and expenses. (Ex. 8.) The Transaction would also allow CABO to extend the maturity of its Revolving Credit Facility, giving the Company additional runway to execute on its business priorities. (*Id.* ¶¶ 36-37.)

Closing the Transaction would also eliminate the $426 million liability that CABO has carried on its balance sheet following GTCR's exercise of the MBI Put, [redacted]

As late as two days before the scheduled closing, CABO and its advisors continued to communicate with CoBank and its advisors about CoBank's potential participation in the Transaction. (Koetje Decl. ¶ 33.) On October 6, 2026, CoBank sent CABO a term sheet that contemplated CABO proceeding with the closing of the MBI Put. (*Id.* ¶ 36, Ex. 7 at 4.) On October 8, 2026, CoBank was actively buying CABO's debt, purchasing a revolving credit facility assignment of approximately $90 million on the secondary market in an effort to disrupt the Transaction. (Koetje Decl. ¶ 35.)

**D. This Action**

On October 9, 2026—the Transaction's scheduled closing date—CoBank filed this action against CABO. Its complaint (Dkt. 1, the "Complaint" or "Compl.") asserts two claims: one for a declaratory judgment under 28 U.S.C. §§ 2201–2202, and one for constructive fraudulent transfer under the Uniform Fraudulent Transfer Act as enacted in Delaware and

Arizona. (Compl. ¶¶ 64-89.) The Complaint seeks a declaration, a TRO, and preliminary and permanent injunctions barring payment of the MBI Put. (*Id.* at 16 (Prayer for Relief).) Concurrent with its Complaint, CoBank also filed an Emergency Motion for Temporary Restraining Order on an *ex parte* basis (Dkt. 11, the "Motion").

Later the same day, after market close, the Court issued an order (Dkt. 13, the "Order") requiring CABO to show cause why an order should not be issued enjoining it from paying the $480 million price in exchange for GTCR's MBI equity interest and temporarily restraining CABO from closing. In contravention of Rule 65, the Order did not require CoBank to post any security; did not explain why the Order was issued; and did not identify the harm to CoBank or why it is irreparable. (*See id.*; Fed. R. Civ. P. 65.)

## ARGUMENT

The TRO must be dissolved. *First*, CoBank cannot demonstrate that the factors of irreparable harm, likelihood of success on the merits, and balance of the hardships support an entitlement to a TRO. *Second*, laches forecloses relief to CoBank, because its own unreasonable delay in filing manufactured the "emergency" it now complains of, thereby materially prejudicing CABO. *Third*, the TRO itself contravenes the strict requirements of Federal Rule of Civil Procedure 65 and related local rules.

### I. COBANK FAILS TO ESTABLISH AN ENTITLEMENT TO A TEMPORARY RESTRAINING ORDER

"On a motion to dissolve a temporary restraining order, the party that obtained the order bears the burden of justifying continued injunctive relief." *Lapa v. JP Morgan Chase Bank, N.A.*, 2022 WL 3290677, at *2 (S.D.N.Y. Aug. 11, 2022). CoBank must therefore establish, by a clear showing, "(i) a likelihood of irreparable harm; (ii) either a likelihood of

success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in [its] favor; (iii) that the balance of hardships tips in [its] favor regardless of the likelihood of success; and (iv) that [the] injunction is in the public interest." *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 604 (S.D.N.Y. 2014); *see also* Fed. R. Civ. P. 65. And because CoBank sought relief *ex parte*, it was required to make an even more exacting showing: "specific facts in an affidavit or a verified complaint [that] clearly show that *immediate* and *irreparable* injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A) (emphases added).

As set forth below, CoBank has failed to establish any of these elements.

### A. CoBank Has Failed To Show It Will Suffer Irreparable Harm.

Irreparable harm is "[p]erhaps the single most important prerequisite" for injunctive relief. *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 *Wright & Miller's Federal Practice and Procedure* § 2948 (1973)). The movant must show "an injury that is neither remote nor speculative, but ***actual and imminent***, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)) (emphasis added). "[W]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Faiveley*, 559 F.3d at 118 (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005)); *Marblegate*, 75 F. Supp. 3d at 606 (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)) ("[I]t is settled law that when an injury is compensable through money

damages there is no irreparable harm.") (internal quotation marks omitted). Here, CoBank cannot show irreparable harm.

*First*, CoBank's alleged injury is purely economic. The only harm CoBank asserts is to its "ability to recover" approximately $1.1 billion of its secured debt—the vast majority ($959 million) of which will not mature until October 2029 (and nearly all of the balance of $90 million of revolving loans that CoBank purchased on the secondary market the day before commencing this suit, seemingly to frustrate CABO's financing plans). (Motion at 2, 4; Koetje Decl. ¶ 35.) CoBank does not allege that CABO has missed a single payment of interest or principal. Nor does it establish any basis to infer an imminent risk that CABO will be unable to make the quarterly amortization payments of approximately $2.5 million as a result of closing the Transaction. [redacted] CoBank cannot show any "actual and imminent" risk of any harm to its interests—much less an irreparable one. *State Farm*, 120 F.4th at 80.

*Second*, even if CoBank were to suffer an economic harm, it already has an adequate legal remedy. The Arizona and Delaware Uniform Fraudulent Transfer Acts would permit it to obtain "[a]voidance of the transfer . . . ***to the extent necessary to satisfy the creditor's claim***." 6 Del. C. § 1307(a)(1) (emphasis added); *see* Ariz. Rev. Stat. Ann. § 44-1007(A)(2). And the statutes give CoBank an express right of action against GTCR: A creditor may "recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less," from the transferee. 6 Del. C. § 1308(b), (b)(1); *see* Ariz. Rev. Stat. Ann. § 44-1008(B), (B)(1). In other words, if CoBank ultimately does

suffer economic injury (and can prove the elements of a constructive fraudulent transfer, which CABO disputes), it may seek recovery from GTCR.

*Third*, CoBank's speculation on "information and belief" that GTCR's entities may "wind down" and distribute proceeds is insufficient under applicable caselaw. (Motion at 3.) "[W]hen the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for a preliminary injunction." 11A *Wright & Miller's Federal Practice & Procedure* § 2949 (3d ed. 1998). Moreover, the cases CoBank cites are either inapposite here or affirmatively support CABO's position. In *Pennantia*, the court held that the defendants' discussions about "winding down their businesses" were "insufficient to establish a likelihood that defendants would be unable to satisfy a money judgment." *Pennantia, LLC v. Rose Cay Mar.*, LLC, 2025 WL 2388807, at *5 (S.D.N.Y. Aug. 18, 2025). And CoBank's remaining cases each involved a defendant who "intended to frustrate any judgment on the merits" by "transfer[ring its assets] out of the jurisdiction." *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) (internal quotation marks omitted); *id.* at 411 (defendant had lied under oath and engaged in "numerous efforts" to "secrete [her] assets" in undisclosed Swiss accounts); *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1354 (2d Cir. 1974) (defendant had fled to the Bahamas and the asset at issue, a yacht, could "depart our shores"); *Hossain v. Mediastar Ltd.*, 2025 WL 2578128, at *6 (S.D.N.Y. Sept. 5, 2025) (defendants moved assets abroad during the litigation while offering "shifting, inconsistent, and unsworn explanations"). CABO is complying with a long-ago publicly disclosed contractual obligation—that is also expressly identified as a Permitted Acquisition under the terms of the Credit Agreement to which CoBank is a party—not secreting assets.

*Fourth*, the TRO does not address any purportedly irreparable injury. The injunction CoBank seeks would not "void GTCR's accompanying Put Right or Cable One's obligation to perform." (Motion at 14.) CABO's obligation to close the MBI Put transaction—and to pay its contractual $480 million purchase price—will remain. CoBank's real grievance is that it wishes CABO were not contractually obligated to purchase an asset that has declined in value since the purchase price formula was agreed to by the parties. CABO also wishes valuations would have gone in the other direction, but it is bound by the agreement it struck and its satisfaction of a legitimate obligation is outside the scope of fraudulent transfer law (because such satisfaction represents reasonably equivalent value). (*See infra* § I.B.) A debtor's satisfaction of an obligation a creditor wishes the debtor did not have is not a harm the UFTA was designed to redress. *See Faircloth v. Rash,* 373 A.2d 870, 872 (Del. Super. Ct. 1977) ("[T]he fact that a conveyance may give a preference to one of the debtor's creditors over another creditor will not invalidate the conveyance if the fair consideration test is met."). Rather, the UFTA remedies fraudulent transfers. 6 Del. C. §§ 1304(a)(1), 1305(a). It is not a tool for a creditor—whose debt is current—to stop the satisfaction of a known obligation simply because the economics have turned out to be unfavorable to the debtor. And here, the Transaction does not even subordinate CoBank's loans or alter its first-lien status; it merely adds new first-lien debt that will rank equally with CoBank's. (Koetje Decl. ¶ 29.) In doing so, CABO would satisfy a debt now due—on the MBI Put—and extend certain of its debt maturities, thereby strengthening its capital structure to the benefit of its shareholders and its creditors, CoBank included. (*Id.* ¶¶ 29, 37.)

**B. CoBank Cannot Demonstrate a Likelihood of Success on the Merits.**

CoBank must also demonstrate "a likelihood of success on the merits or

sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in [its] favor." *Marblegate*, 75 F. Supp. 3d at 604. It cannot. The satisfaction of an antecedent debt (the put obligation) provides reasonably equivalent value under the UFTA. CoBank cannot prospectively enjoin CABO's use of its property without having obtained a judgment.

*First*, CoBank misstates the value received by each party to the MBI Put transaction. CoBank argues that there is no "reasonably equivalent" exchange of value—as required by the UFTA—because CABO is to exchange $480 million in cash for $38.1 million in MBI equity value. (*See* Motion at 7-8.) That is incorrect.

Under the UFTA and its successor statutes, "[v]alue is given for a transfer . . . if, in exchange for the transfer . . . , property is transferred ***or an antecedent debt is secured or satisfied***." 6 Del. C. § 1303(a) (emphasis added); Ariz. Rev. Stat. Ann. § 44-1003(A); N.Y. Debt. & Cred. Law § 272(a). Courts repeatedly hold that a "transfer made in satisfaction of an antecedent debt or for an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value." *In re Direct Response Media, Inc.*, 466 B.R. 626, 660 (Bankr. D. Del. 2012) (construing 11 U.S.C. § 548(d)(2)(A)); *see also* 6 Del. C. § 1303(a). Because "[t]he Bankruptcy Code and Delaware statute both define 'value' to include satisfaction of an antecedent debt," "[p]ayments that satisfy an otherwise valid antecedent debt are accordingly made for reasonably equivalent value." *In re Pack Liquidating, LLC*, 2025 WL 2587577, at *8 (Bankr. D. Del. Sept. 5, 2025). Arizona law is the same. *Cf. In re Viscount Air Servs., Inc.*, 232 B.R. 416, 435-436 (Bankr. D. Ariz. 1998) (applying Ariz. Rev. Stat. Ann. § 44-1003(A)); *see also In re White*, 591 B.R. 884, 889 (Bankr. D. Utah 2018) (applying Utah's UFTA) ("a transfer that results in a dollar-for-dollar reduction of a valid, antecedent debt . . . has no impact on a debtor's net worth and thus results in no prejudice to other creditors.").

Executing the Transaction satisfies a $480 million antecedent debt that CABO has held since GTCR exercised the MBI Put nine months ago. CoBank itself acknowledges that CABO is carrying a current liability of $426 million on its books—representing the difference between the $480 million purchase price and the book value of the MBI equity stake it will acquire. (Motion at 3.) That liability will be extinguished by the closing of the Transaction. CoBank argues that the MBI Put is not "akin to satisfaction of an antecedent debt because satisfaction of an antecedent debt carries consideration in the form of 'access to the loan proceeds, and by granting collateral, [the debtor] either gets access to new funds or retains access to previously advanced funds.'" (*See id.*) But that argument is flawed because it ignores the value associated with extinguishing a $480 million purchase price liability and focuses exclusively on the value of the MBI equity.[6] And *In re Pack Liquidating* confirms that the satisfaction of an antecedent debt constitutes reasonably equivalent value even in non-loan contexts; there, the court found "reasonably equivalent value" where the debtors paid outstanding invoices. 2025 WL 2587577 at *8.

[redacted]

---

[6] The put was structured in a manner similar to a loan, such that CABO could settle it early (at CABO's option) and receive a 12% discount (annualized) based on when it is paid. (Koetje Decl. ¶ 12.) As such, the MBI Put was effectively treated as junior debt; it had an interest rate, maturity, and was prepayable at CABO's option. (*Id.*)

[redacted] That is the definition of reasonably equivalent value. If paying the MBI Put depleted CABO's assets without an equivalent return, its balance sheet would be worse after closing than before. [redacted]

CoBank's own authority holds that "[s]atisfaction of a pre-existing obligation is 'value'" and favorably cites a decision in which the obligation was an oral bonus promise rather than a loan. *In re F-Squared Inv. Mgmt., LLC*, 600 B.R. 294, 308–09 (Bankr. D. Del. 2019). And *In re Exide Techs., Inc.* is no help: The passage CoBank quotes is the court's summary of the lenders' argument, not a holding, and the court's rejection of a *per se* rule addressed guarantees and liens securing debt, not the satisfaction of an existing obligation. 299 B.R. 732, 747 (Bankr. D. Del. 2003).

*Second*, CoBank's claim for relief runs headlong into the Supreme Court's holding in *Grupo Mexicano*, which recognized the common-law rule that a plaintiff may not interfere with a debtor's use of property absent a judgment fixing its debt. 527 U.S. at 321. CoBank has not obtained any judgment, yet the TRO interferes with CABO's use of its cash earmarked to fund the Transaction.

CoBank's attempt to distinguish *Grupo Mexicano* on the ground that the transfer here is "unlawful by statute" (Motion at 14 n.2) fails. CoBank's argument is premised on language drawn from the Court's discussion of mootness—not its merits holding. *Grupo Mexicano* concerned an appeal from a preliminary injunction against the transfer of assets on the grounds that the transferor was "at risk of insolvency if not already insolvent." 527 U.S. at 312.

The transferor took an interlocutory appeal on the grounds that "such an injunction can be issued only after the judgment is rendered." *Id.* at 315.

While the appeal was pending, the district court entered a final injunction. In assessing whether the final injunction mooted the appeal, the Court noted that the preliminary injunction "was issued not to enjoin unlawful conduct, but rather to ***render*** unlawful conduct that would otherwise be permissible, in order to protect the anticipated judgment of the court." *Id.* Thus, the petitioner could still seek to recover on the bond for an improperly issued preliminary injunction even if the final judgment were proper, saving the petitioner's appeal from mootness. Similarly here, the TRO does not "enjoin ***unlawful*** conduct," *id.*, contrary to CoBank's claim. There has been no judgment of unlawfulness. Instead, it was entered "to ***render*** unlawful conduct that would otherwise be permissible, in order to protect the anticipated judgment of the court." *Id.* *Grupo Mexicano* makes clear that the federal courts lack equitable authority to afford such relief against a debtor's use of its own property absent a judgment. Importantly, the Court made clear that insolvency does not serve as an exception to the general rule requiring a judgment.[7] *Id.* at 320 n.4.

*Third*, while *Grupo Mexicano* did not reach the question of whether state fraudulent transfer statutes might alter the default common law rule, *id.* at 324 n.7, the UFTA does not authorize prospective relief. The text "does not expressly permit an injunction restricting the debtor's disposition of assets before any transfer has taken place." 4F *N.Y. Prac., Com. Litig. in N.Y. State Courts* § 129:21 (5th ed.). The UFTA's injunctive remedy is available "against ***further*** disposition by the debtor or a transferee, or both, of the asset transferred or of

[7] In any event, CABO disputes that it is insolvent. (*See* Motion at 9-11.)

other property." 6 Del. C. § 1307(a), (a)(3)(a); Ariz. Rev. Stat. Ann. § 44-1007 (emphasis added). "Further" disposition presupposes a prior transfer.

*Fourth,* no more logical is CoBank's assertion that CABO is "favoring a contractual counterparty" over "its secured creditor." (Motion at 8.) At most, that could be a *preference*, but few points of law are "more ungrudgingly accepted" than that "the preferential transfer does not constitute a fraudulent conveyance." *In re AppliedTheory Corp.*, 323 B.R. 838, 841 (Bankr. S.D.N.Y. 2005) (internal quotation marks omitted); *see also id.* (citing Alan N. Resnick, Bankruptcy Law Manual § 8:34 (5th ed. 2005)) ("[A]n insolvent debtor receives value by paying an old obligation. For this reason, making a preference in good faith is not a fraudulent conveyance because value is exchanged by the cancellation of the antecedent debt."). CABO disputes CoBank's allegation of insolvency, but regardless, satisfaction of a contractual obligation is reasonably equivalent value under the UFTA and thus CoBank's fraudulent transfer claim cannot survive.

Even if CoBank could otherwise establish that a transfer to GTCR would constitute a fraudulent transfer—and it cannot—it is only entitled to "[a]voidance of the transfer or obligation ***to the extent necessary to satisfy the creditor's claim***." 6 Del. C. § 1307(a)(1) (emphasis added); *accord* Ariz. Rev. Stat. Ann. § 44-1007(A)(2). Here, CABO's debt to CoBank under the Credit Agreement does not mature until—at earliest—February 2028 (with respect to CoBank's revolving credit loans of approximately $96 million) and much later—October 2029—with respect to the vast majority ($959 million) of CoBank's term loans. (Koetje Decl. ¶ 8.) CoBank has made no showing—or even an allegation—that CABO has missed even *one* payment with respect to CoBank's loans or would be likely to miss one imminently following the closing of the Transaction—much less that avoidance of the entire

transaction is "necessary to satisfy [its] claim." 6 Del. C. § 1307(a)(1). A $96 million maturity in fifteen months does not justify blocking the performance of a $480 million contractual obligation today.

### C. The Balance of the Hardships and Public Interest Do Not Tip in CoBank's Favor.

CoBank has argued that "no party with a valid interest would be meaningfully harmed by the TRO issued to preserve the status quo pending a preliminary injunction proceeding." (Motion at 14.) To the contrary, the TRO imperils a delicate and complex deal involving some 20 different counterparties (none of which are obligated to participate in the Transaction) and that is of critical importance to the Company. (Koetje Decl. ¶ 39.)

*First*, the Transaction entails $1.3 billion in financing, $480 million of which would be used to repay revolving debt obligations incurred by CABO to fund the put, while the remainder will refinance other near-term secured debt maturities and will be coupled with an extension of the Company's Revolving Credit Facility, providing the time and the funds necessary for the Company to execute on its business priorities. The Transaction was negotiated after months of efforts to obtain financing from the capital markets and other parties. (*Id.* ¶ 31.) While the GTCR lender group is currently prepared to proceed with funding the Transaction and the Company's revolving credit lenders are prepared to extend their maturity, it is well accepted that "time kills all deals." If the lenders begin to abandon the deal in the face of extended delays, there is material risk that the Company will lose the benefit of a critically important financing opportunity at a critically important moment. *Cf. Wesley Coll., Inc. v. Girard Bank Delaware*, 1984 WL 8214, at *1 (Del. Ch. Jan. 20, 1984) (denying application for temporary restraining order where "it might be impossible to restore the true status quo if defendants prove to be

correct").

*Second*, given the importance of the Transaction, the TRO is causing immediate and ongoing harm to the CABO stockholders. *See Hanson Tr. PLC v. SCM Corp.*, 617 F. Supp. 832, 836 n.2 (S.D.N.Y. 1985), *rev'd on other grounds*, 774 F.2d 47 (2d Cir. 1985) ("In balancing the hardships it is appropriate for the Court to consider the interest of the shareholders."). On the afternoon of October 8, the Wall Street Journal reported "Cable One is nearing a deal for roughly $1.25 billion in new financing to address its balance sheet."[8] CABO's stock price jumped 30% in after-hours trading on the news. After CoBank's Complaint was filed at approximately market open on October 9, the Company's stock immediately dropped by 20% and was down more than 30% in after-hours trading. The immediate decline in the Company's stock price upon the filing of this suit reflects the potentially significant damage to the Company and its stakeholders if the Transaction is not permitted to proceed. If the TRO continues, CABO will lose the benefit of a critically important financing opportunity at a critically important moment, and its stockholders will continue to pay the price.

[redacted] Such harm represents a meaningful factor for the Court to consider in balancing the hardships. *See In re AMR Corp.*,

[8] *See* Samantha Kroontje & Alicia McElhaney, *Cable One Nears $1.25 Billion Financing Deal*, Wall St. J. Pro Bankr. (Oct. 8, 2026, 5:16 PM), https://www.wsj.com/pro/bankruptcy/cable-one-nears-1-25-billion-financing-deal-8df74257.

502 B.R. 23, 42 (Bankr. S.D.N.Y. 2013) (crediting affidavits of executives at merging companies pointing to the "adverse[] impact [on] employee morale" and "risk of losing critical employees," and agreeing that "delaying or enjoining the merger is also very likely to have a significant negative impact on the employees at both [companies]").

*Fourth*, it is against the public interest to let a single disgruntled lender frustrate the business decisions of numerous sophisticated market participants. Here, CABO, MBI, GTCR, and the other lenders agreed to the Transaction after extensive arm's-length negotiation, which was subject to an extensive governance process, and dozens of meetings held over the course of months. (Koetje Decl. ¶ 32.) The Court should not endorse CoBank's disruption of those parties' bargaining efforts. *See, e.g.*, *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 356 (2019) ("In New York, agreements negotiated at arm's length by sophisticated, counseled parties are generally enforced . . . pursuant to our strong public policy favoring freedom of contract."); *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 67–68 (1978) ("Absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party."). Despite CoBank's protestations, there is nothing unlawful about the Transaction and it should be permitted to proceed without further delay.

## II. THE TRO IS BARRED BY LACHES

Laches applies where a plaintiff (1) has knowledge of a claim, (2) unreasonably delays in bringing the claim, and (3) thereby causes prejudice to the defendant. *Chai v. Maginn*, 2024 WL 4356303, at *11 (Del. Ch. Oct. 1, 2024); *accord Flynn v. Rogers*, 172 Ariz. 62, 66-67 (1992). And where the plaintiff's delay has "contributed to the emergency nature of its application," courts may deny the motion on that basis alone. *CNL-AB LLC v. E. Prop. Fund I*

*SPE (MS Ref) LLC*, 2011 WL 353529, at *5 (Del. Ch. Jan. 28, 2011); *accord Isgro v. Wells Fargo Bank, N.A.*, 2019 WL 273373, at *5-*6 (Ariz. Ct. App. Jan. 22, 2019).

Here, CoBank had full knowledge of the Company's efforts to conclude a transaction with GTCR every step of the way. GTCR's exercise of the MBI Put was first publicly disclosed on January 5, 2026. (Jan. 5 Form 8-K, Item 1.01.) CABO disclosed the approximately $480 million price of the put in August. (Q2 2026 Form 10-Q at 37.) CoBank was in active negotiations with CABO throughout the remainder of August and September about a transaction that would enable CABO to repay its revolving debt obligations incurred to fund the put. (*See* Koetje Decl. ¶¶ 18-23.) It provided proposals on September 4 and September 9 that expressly contemplated that its financing would serve that purpose—[redacted]. On September 17—nearly a month before CoBank filed its "emergency" TRO motion—[redacted]

By the time the initial October 1 deadline to close arrived, CoBank not only knew that CABO, GTCR, and a group of lenders were in advanced discussions for a loan to CABO of approximately $1.2 to $1.3 billion (a portion of which would be used to refinance debt used to satisfy CABO's obligations to close the MBI Put), but it was actively seeking to thwart the nascent transaction by encouraging CABO's revolving credit lenders to withdraw their support and to defect to an alternative transaction spearheaded by CoBank (which, [redacted] was entirely unactionable). (Koetje Decl. ¶¶ 27, 30.) Like those of GTCR, CoBank's transaction proposals *also* expressly

contemplated a financing that would allow CABO to repay its revolving debt obligations to fund the put—just on terms that CoBank deemed more beneficial to itself than the GTCR-arranged financing. (*See, e.g.*, Ex. 2 at 11-12.) When CABO and GTCR agreed to an extension of the deadline to October 9, 2026, CoBank learned of the extension immediately and remained apprised of the status of ongoing discussions. (Koetje Decl. ¶ 28.)

Despite knowing that a deal was imminent since September, CoBank waited to file a Complaint and *ex parte* motion until October 9—***the very day closing was scheduled to occur***. Such a delay was patently unreasonable. Delaware and Arizona courts have held similarly delayed requests for relief barred by laches. *See CNL-AB LLC*, 2011 WL 353529, at *6 (denying temporary restraining order where plaintiff filed "eleventh-hour suit" after having "unreasonably sat on its hands for two weeks"). *Cf. Mathieu v. Mahoney*, 174 Ariz. 456, 459 (1993) (holding that complaint unnecessarily filed after a monthlong delay and just days before challenged ballot initiative, leaving defendant only 24 hours to prepare its defense, was barred by laches). Because CoBank's delay was of its own making, the TRO it obtained must meet the same fate. CoBank manufactured the artificial "emergency nature" of its claims, and it should not be rewarded by permitting the TRO to remain in place.

## III. THE TEMPORARY RESTRAINING ORDER IS PROCEDURALLY DEFICIENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 65 AND S.D.N.Y. LOCAL RULES.

Federal Rule of Civil Procedure 65 sets forth the requirements a TRO must satisfy, and a TRO that fails to satisfy those requirements must be dissolved. *See Austin v. Altman*, 332 F.2d 273, 275 (2d Cir. 1964) (noting that "a district court should scrupulously observe the requirements of Rule 65 in the delicate business of granting temporary restraining

orders," and criticizing ex parte TRO entered where opposing parties "could easily have been summoned for a preliminary hearing").

Moreover, "[t]he bar for issuing an *ex parte* relief is extremely high." *Bartolini v. Town of Yorktown*, 2026 WL 189725, at *1 (S.D.N.Y. Jan. 23, 2026). Because CoBank took the extraordinary step of seeking *ex parte* relief, it was required to satisfy additional requirements. Rule 65(b)(1)(B) requires that "the movant's attorney [must] certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Similarly, Local Civil Rule 6.1(d) requires a party seeking an *ex parte* order to submit an "affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary." *See Bragg v. Jordan*, 669 F. Supp. 3d 257, 264 (S.D.N.Y. 2023) (declining to enter order to show cause where no such affidavit was submitted). This Court's Individual Practices provide that "***except in the most extraordinary circumstances***, litigants filing an order to show cause or motion for injunctive relief must provide notice to opposing counsel before doing so." Judge Marrero Ind. R. VII.D. (emphasis added).

Here, CoBank submitted no written certification by its attorney nor an affidavit justifying *ex parte* relief. Rather, it offers only the perfunctory (and baseless) justification that notice would "encourage Cable One to complete the fraudulent transfer." (Motion at 3.) Of course, CABO was already working to complete the Transaction because CoBank had waited until the day of the closing deadline to sue. CoBank's weak excuse neither complies with the letter of the rules nor overcomes CABO's essential rights of notice and an opportunity to be heard. *See Granny Goose Foods*, *Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 438-39 (1974) ("The stringent restrictions imposed by . . . Rule 65, on the availability of *ex parte* temporary restraining orders reflect the fact that our entire

jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute.").

Moreover, the TRO violates numerous other requirements of Rule 65. A TRO must, among other things, (1) describe the harm to the movant and state why it is irreparable, Fed. R. Civ. P. 65(b)(2); (2) state why the order was issued without notice, *id.*; and (3) state the reasons why it issued, Fed. R. Civ. P. 65(d)(1)(A). However, the Order does not state the nature of any injury to CoBank, nor why the payment of the MBI Put to GTCR would cause it irreparable harm. (Order at 1.) Apart from requiring that CoBank serve the Order and the papers on which it was granted to CABO, the Order makes no acknowledgment that it was granted on an *ex parte* basis. (*See id.* at 2.) Nor does it contain any reasoning explaining why it was issued.

Finally, Rule 65(c) is clear that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Here, the TRO restrains not only a $480 million M&A transaction, but also a $1.3 billion financing package. The TRO has wrongfully thrown both deals into jeopardy; yet CoBank has not been ordered to post even a nominal security.

## IV. SHOULD THE COURT RETAIN THE TRO, IT SHOULD ORDER COBANK TO POST A SUBSTANTIAL BOND.

If the Court were inclined to keep the TRO in place (which it should not, for the reasons above), it cannot do so without requiring CoBank to post sufficient security. *See* Fed. R. Civ. P. 65(c). By obtaining a restraint, the applicant "consents to liability up to the amount of the bond, as the price for [the injunction]." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith,*

*Inc.*, 910 F.2d 1049, 1054–55 (2d Cir. 1990) (quoting *Com. Tankers Corp. v. Nat'l Mar. Union*, 553 F.2d 793, 800 (2d Cir. 1977)). And because a wrongfully restrained party may recover only "up to the amount of the bond," *Blumenthal*, 910 F.2d at 1056, the Order as entered leaves CABO with no recourse at all for the harm CoBank's deceptively acquired TRO is inflicting.

The amount of security must "bear some relationship to the value" at risk, *Interlink Int'l Fin. Servs., Inc. v. Block,* 145 F. Supp. 2d 312, 319 (S.D.N.Y. 2001), and courts in this District do not hesitate to set bonds commensurate with the commercial stakes, *see Sanofi-Synthelabo v. Apotex, Inc.*, 488 F. Supp. 2d 317, 349 (S.D.N.Y. 2006) (setting $400 million bond based on restrained party's potential "lost profits, lost market share and associated costs of relaunch"). The stakes here are of that order. Every day the TRO remains in place, CABO risks losing the financing partners whose interlocking commitments it needs to satisfy its contractual obligation to GTCR and shore up its balance sheet; its stockholders continue to bear the uncertainty that has already driven down the Company's stock price; and the employees of both CABO and MBI remain in limbo. (Koetje Decl. ¶¶ 39-41; *see supra* § I.C.)

Because the TRO restrains the payment of a $480 million contractual obligation by halting the Transaction, if the Court keeps the TRO in place pending a hearing on CoBank's request for a preliminary injunction, it should order CoBank to post a bond of $480 million. (Koetje Decl. ¶ 41.)

## CONCLUSION

For the foregoing reasons, CABO respectfully requests that the Court dissolve the TRO. If the Court retains the TRO and sets a hearing on a motion for preliminary injunction, it should order CoBank to post a $480 million bond pursuant to Federal Rule of Civil Procedure 65(c).

Dated: October 13, 2026

Respectfully submitted,

*/s/ Michael A. Paskin*
Michael A. Paskin
Justin C. Clarke
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
mpaskin@cravath.com
jcclarke@cravath.com

*Attorneys for Defendant Cable One, Inc.*

**CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I certify under penalty of perjury that the foregoing memorandum of law contains 8,750 words, exclusive of the caption, any table of contents, table of authorities, signature block, and this certificate, as counted by the word-processing program used to prepare it, and therefore complies with the applicable word-count limitation.

Dated: October 13, 2026

Respectfully submitted,

*/s/Michael A. Paskin*

Michael A. Paskin
Justin C. Clarke
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
mpaskin@cravath.com
jcclarke@cravath.com

*Attorneys for Defendant Cable One, Inc.*